BELONIE BOUCHARD

*vs.*

DIRIGO MUTUAL FIRE INSURANCE COMPANY.

Somerset.    Opinion February 3, 1915.

*Engine.    Exceptions.    Explosive Material.    Forfeiture of Policy.    Gasoline.
Increase of Risk.    Insurance.    "Kept and Used."    Nonsuit.
"Prohibited Articles."    "Stored and Kept."
Threshing Grain.*

1.    That although gasoline was conceded to be included in the prohibited list, it was not "kept or used" by the plaintiff under the facts of this case within the inhibition of the contract.    These words imply something more than possession for a temporary purpose.

2.    Nor was the increase of risk clause violated, which provides that the policy shall be void if without the written consent of the insured "the situation or circumstances affecting the risk shall, by or with the advice, agency or consent of the insured be so altered as to cause an increase of such risks."    These words imply something of duration, and a casual change of a temporary character, such as in the case at bar, does not render the policy void as a matter of law.

3.    That both clauses should be construed in the light of the entire contract, the situation and character of the property insured and the natural and necessary uses to which it must be put by the owner, and the application of this rule of construction confirms the inference already drawn from the language of the clauses themselves.

4.    That the policy is not avoided when the use made of the prohibited articles or the general use and operation of the property is necessarily incident to the business of the insured, and therefore presumed to be recognized and impliedly permitted by the insurer.

5.    That in view of the correspondence between the parties and the fact that the defendant denied all liability, the jury might well have found that it had waived the requirement as to proof of loss.

On exceptions by plaintiff.    Exceptions sustained.

This is an action on a fire insurance policy, issued August 22, 1911, on plaintiff's farm buildings and personal property, which were

destroyed by fire on the 28th day of November, 1912. Plea, the general issue, together with brief statement of special matters in defense. At the conclusion of plaintiff's testimony, the presiding Justice ordered a nonsuit, and the plaintiff excepted to said order.

The case is stated in the opinion.

*Fred F. Lawrence,* for plaintiff.

*S. W. Gould,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, HANSON, JJ.

CORNISH, J. Action on a fire insurance policy for loss of plaintiff's farm buildings and personal property. The presiding Justice ordered a nonsuit. The main issue is whether the fact that the fire was caused by the operation of a gasoline engine by the plaintiff for threshing grain, in the barn floor, avoided the policy either because it violated the "prohibited articles" clause or the clause against increase of risk.

1. *Prohibited Articles.*

The standard policy contains this provision among others: "This policy shall be void . . . . if camphene, benzine, naphtha or other chemical oils or burning fluids shall be kept or used by the insured, on the premises insured," with certain exceptions not material here. It is conceded that gasoline is within the prohibited list and the crucial question is whether under the facts of this case it was "kept or used" within the inhibition of the contract. The record shows that the plaintiff had lived on this farm in Skowhegan since the spring of 1908, and had been insured by the defendant during that time, the policy in suit being a renewal of a former policy in the same company; that each year he had employed men to thresh his grain by the use of a gasoline engine in precisely the same manner as on the day of the fire; that these men travelled from farm to farm doing the work and that practically all of the grain in that community is threshed in the same way, the engine being placed within or without the barn according to the location of the grain; that in 1912 the plaintiff, with one Herbert, had purchased the engine and had set it up in his barn for the purpose of threshing his grain, and in about an hour after the operation began, the fire occurred,

in precisely what manner or from what immediate cause it does not appear. Under these circumstances did the plaintiff "keep or use" gasoline within the meaning of the policy? We think not.

In the first place, the words themselves usually import something more than temporary possession or possession for a temporary purpose. "To keep" implies something more than merely to have. It carries with it the idea of continuance and duration. Such is its common acceptation, as "to keep a secret," "to keep the peace," "to keep a promise," "to keep a certain line of goods," "to keep store," or to "keep house." Such is its definition by lexicographers. "To keep" is "to have and retain in one's control or possession," Standard Dic.; "To continue to hold," "To conduct or carry on," "To have habitually in stock for sale," Webster New Int. Dic.

The verb "To use" in this connection and in collocation with "keep" naturally suggests the same idea of employment on more than a single occasion. It implies the customary or habitual rather than the accidental or the temporary. These definitions have the sanction of authority. In *Thompson* v. *Equity Fire Ins. Co.*, L. R., App. Cas. 1910, 592, a building was insured and the words were "keep or store," instead of "keep or use" as here, and the court held that a small quantity of gasoline in a stove being used for cooking purposes, which caused the fire, no other gasoline being in the building, was not an infringement of the condition. The court say:

"What is the meaning of the words 'stored or kept,' in collocation and in the connection in which they are found? They are common English words with no very precise or exact signification. They have a somewhat kindred meaning and cover very much the same ground. The expression as used in the statutory condition seems to point to the presence of a quantity not inconsiderable, or at any rate not trifling in amount, and to import a notion of warehousing or depositing for safe custody or keeping in stock for trading purposes. It is difficult if not impossible to give an accurate definition of the meaning, but if one takes a concrete case it is not very difficult to say whether a particular thing is 'stored or kept' within the meaning of the condition. No one probably would say that a person who had a reasonable quantity of tea in his house for domestic use was 'storing or keeping' tea there, or to take the instance of benzine, which is one of the prescribed articles, no one would say that a person who had a small bottle of benzine for removing grease spots or cleansing purposes

of that sort was 'storing or keeping' benzine. The learned counsel for the respondents contend that the presence of gasoline on the premises was enough to bring the statutory condition into operation and he referred to the accident which did happen as an example of the danger against which precautions are required. But it is obvious that the danger guarded against is not ignition caused by the article itself, but the risk of spreading or increasing the conflagration when once started and in progress by the presence of highly inflammable or explosive material. The fact that the fire in the present case was caused by the gasoline is irrelevant. And the fatal objection to the defendant's contention is that it gives no effect whatever to the words 'stored or kept' and the meaning which the defendants seek to attribute to it might possibly or even probably prevail if the words in question had been omitted altogether, and the condition had excluded liability for loss or damage occurring while  . . .  gasoline  . . . is .  .  .  in the building insured. Some meaning must be given to the words 'stored or kept.' "

While the words in the case at bar are "kept or used" instead of "kept or stored" as in the English case, and therefore the idea of storage is embraced in the one instead of use in the other, yet both have the word "keep," and so far as the reasoning in the cited case refers to that word it carries weight in our present discussion. "The word 'kept' as used in the policy, (of the same form as in the case at bar) implies a use of the premises as a place of deposit for the prohibited articles for a considerable period of time," says the Massachusetts Court in *First Cong. Church* v. *Ins. Co.*, 158 Mass., 475. A similar definition, excluding the idea of mere temporary presence, is given in *Cleete* v. *Ins. Co.*, 144 Wis., 638; *Smith* v. *Ins. Co.*, 107 Mich., 270, 30 L. R. A., 368, and see note 13 A. & E. Ann. Cas., 542.

The definition of "use" was discussed by the court in *Means* v. *Ins. Co.*, 92 Pa., 15, as follows: "We are not disposed to give to the word 'use' in this policy the narrow construction claimed for it. It must have a reasonable interpretation,—such as was contemplated by the parties at the time the contract was entered into. . . . . . What is intended to be prohibited is the habitual use of such articles, not their exceptional use upon some emergency. The strict rule claimed by the defendants would prevent the assured from painting his house or cleaning his furniture, as it would be difficult to do either

without using some of the prohibited articles." The court followed the same definition of "use" in *Lebanon County* v. *Ins. Co.*, 237 Pa. St., 360.

A careful definition of "kept or used" is found in the recent case of *Springfield F. & M. Ins. Co.* v. *Wade*, 95 Tex., 598, 58 L. R. A., 714, where the words of prohibition were "kept, used or allowed," and they were held not to cover a case where a gallon of gasoline was brought on to the premises for temporary use, although such act in fact caused the destruction of the property. "It is not enough," say the court, "That hazardous articles are upon the premises; they must be there for the purpose of being stored or kept, . . . As the word 'kept' means that the prohibited article must not only be upon the premises, but must be there for keeping or storing, and not merely upon a temporary occasion for a different purpose, it follows that there must be some degree of permanency in its continuance there. The word implies all this. The word 'used' is employed in immediate connection with 'kept,' in order, we think, to extend the provision so as to exclude the idea that the article must be stored or deposited on the premises. But the purpose in the use of each word is to provide against the same danger, viz., that which would arise from the habitual, constant or continued exposure of the property, through the presence or use of the article. One word forbids the permanent or habitual keeping of the dangerous thing, and the other a like use of it, without the actual depositing or storing of it." See also *Hynds* v. *Ins. Co.*, 11 N. Y., 554; *Farmers Ins. Co.* v. *Simmons*, 30 Pa., 299, *Mears* v. *Ins. Co.*, 92 Pa. 15; *Szynkno* v. *Ins. Co.*, 114 Ill., App. 401, and *Adair* v. *Ins. Co.*, 107 Ga., 297, 45 L. R. A., 204, the last involving the temporary use of a machine for threshing grain on the premises where the insured property was located.

2. *Increase of risk.*

The language is that the policy shall be void if without the written consent of the insurer "the situation, or circumstances affecting the risk, shall, by or with the advice, agency or consent of the insured be so altered as to cause an increase of such risks." What constitutes an alteration of the situation or circumstances affecting the risk as to cause an increase of risk? Here we must distinguish between occasional negligent acts of the insured which may not only tend to increase the hazard for the time being but perhaps even cause the fire, and an

alteration of the situation or circumstances. In a certain sense all negligent acts of the insured have a tendency to increase the risk and yet the policy is not thereby avoided, because one's own carelessness is one of the very things insured against, otherwise insurance would afford little protection and the policy holder would be insuring himself. The insured who works in his barn or upon the hay mow, or in his woodshed, with a lighted pipe or cigar evidently increases the risk; so does the housewife who builds too brisk a fire, leaves the stove filled with wood and the draughts wide open, or deposits hot ashes in a wooden receptacle. But acts like these, while they may temporarily increase the hazard, do not so alter the situation or circumstances affecting the risk as to avoid the policy. They may constitute negligence on the part of the owner, but neither the situation of the property itself nor the circumstances surrounding it can with reason be said to be altered. "These words imply something of duration and a casual change of a temporary character would not ordinarily render the policy void under this provision." *First Cong. Church* v. *Ins. Co.*, 158 Mass., 475. See also *Lord* v. *Ins Co.*, 2 Gray, 221; *Coml'th* v. *Ins. Co.*, 112 Mass., 136; *King Brick Co.* v. *Ins. Co.*, 164 Mass., 291.

One object in requiring the written consent of the company in case of increase of risk doubtless is to enable the company to charge an additional premium therefor, during the continuance of the increase, and this presupposes a period of substantial duration. "An increase of risk which is substantial and which is continued for a considerable portion of time is a direct and certain injury to the insurer and changes the basis on which the insurance rests." *Kyle* v. *Ins. Co.*, 149 Mass., 116-123. Here, then, as in the prohibited articles clause, the words themselves ordinarily import something more than a mere temporary exposure to additional hazard, and it is the opinion of the court that it could not be said as a matter of law that the act of the plaintiff constituted a breach of this condition.

Let us take another and broader view. Both the prohibited articles clause and the increase of risk clause must be construed in the light of the entire contract, the situation and character of the property insured and the natural and necessary use to which it must be put, and the application of this universal rule of construction confirms the inferences already drawn from the precise language of the clauses themselves.

The buildings insured were not city property but farm buildings, consisting of a dwelling house, store-house and frame barn, together with various farming machinery, implements, vehicles, etc. It could not have been in the mind of either the plaintiff or the defendant that the barn in which the fire started was to be locked and lie idle. Both the parties knew that the plaintiff was to continue to use his buildings in the ordinary course of husbandry, as the ordinary farmer uses them in the pursuit of his legitimate occupation. The policy was not intended nor should it be permitted to prevent such use. The threshing of grain is as much a necessary incident of farm work as is harvesting and storing in the barn. Formerly threshing was done by horse power, but that method has become well nigh if not wholly obsolete, and the uncontradicted evidence shows that practically all the grain in the plaintiff's community is now threshed with the aid of a gasoline engine. This is common knowledge. The defendant, which makes a specialty of farm risks, must have known it. Its local agent through whom the first policy was issued was himself a farmer and lived within three or four miles from the plaintiff's premises, and must have been familiar with the general situation and custom, and the local agent who issued the policy in suit, a renewal of the first, also resides in Skowhegan. Knowledge of conditions, existing at the time the contract is made, is always taken into consideration in construing the rights of the parties thereunder, as in the case of vacancy. *Guptill* v. *Ins. Co.*, 109 Maine, 323.

The plaintiff was making the same use of his barn and was carrying on his ordinary occupation in the same manner as when the policy was issued, and the same as all other farmers were customarily doing. It was a reasonable and necessary use. It was impracticable if not impossible to secure the threshing of his grain by any other process, and under such circumstances, which must have been known to the insurer when the policy was issued, we cannot hold that the plaintiff was thereby violating the conditions of his policy. If such an act constituted a forfeiture then he had been uninsured since the engine was used on the first occasion after the policy was issued, because a breach occurred then if at all, and we have recently held that a policy once forfeited cannot be revived except by waiver or mutual agreement. *Dolliver* v. *Ins. Co.*, 111 Maine, 275.

And not only, under such a construction, would this policy have been long since forfeited, but it is safe to assume that practically all

the farmers in that section would find their policies in the same condition. If a fair and reasonable interpretation of the policy requires it, of course the injustice of the result must not be interposed to prevent it. Parties must be bound by the contracts they make. But a result so disastrous and universal raises a strong presumption that it was not within the contemplation of the parties and the contract should not be so construed except by compulsion of the language.

This rule that the policy is not avoided where the use made of the prohibited articles, or the general use and operation of the property, was necessarily incident to the business of the insured, and therefore presumed to be recognized and impliedly permitted by the insurer, is well settled and of wide and general application.

Thus in manufacturing establishments the keeping or using of an article necessarily incident to the manufacturing process or to the carrying on of the business will not avoid a policy, even though its keeping or using be expressly prohibited: as the use of gasoline in a silver plating factory, *Silver Plate Co.* v. *Ins. Co.*, 170 Pa. St., 151; Keeping a small quantity of benzine for use in a furniture repair shop, *Faust* v. *Ins. Co.*, 91 Wis., 158; Keeping benzine for finishing purposes in a furniture factory, *Davis* v. *Pioneer Furniture Co.*, 102 Wis., 394; Keeping benzine in a wagon factory for the purpose of mixing paints, *Archer* v. *Ins. Co.*, 43 Mo., 434; Keeping camphene in a printing establishment for use in cleaning type, *Harper* v. *Ins. Co.*, 22 N. Y., 441; petroleum in a flour mill for lubricating purposes, *Corlin* v. *Ins. Co.*, 57 Md., 515. In all of these instances, and in many more gathered in the note to 13 A. & E. Ann. Cas. 540, the use of the prohibited article was not merely once a year for a short time, as here, but continuous; nevertheless, as it was necessary to the conduct of the business its use for such a purpose was held to be within the implied permission of the insurer. The same reasoning and the same rule apply with equal force to agricultural pursuits and the ordinary and necessary use of farm buildings in connection therewith.

Based on the same principle is a class of cases growing out of the use of prohibited articles in making repairs. It is not to be presumed that when an owner effects insurance on his building he precludes himself from the right not only to use it in the customary manner but also to make the usual and ordinary repairs in a reasonable and proper manner, in the absence of anything in the policy expressly prohibiting the same. It has been frequently held that such repairs, thus

properly made, do not avoid the policy even where the fire hazard is obviously increased. In *Dobson* v. *Sotheby*, 1 Moody & M. 90, 31 Rev. Rep. 718, the policy was issued at a low rate payable on buildings in which no fire was kept and no hazardous goods deposited. The building required tarring, a fire was lighted in the inside, a tar barrel brought into the building for the purpose of performing the necessary operations. The tar took fire through the negligence of the workmen and the premises burned. Lord Tenterden said: "The common repairs of a building necessarily require the introduction of fire upon the premises and one of the great objects of insuring is security against the negligence of servants and workmen. I cannot therefore be of opinion that the policy was in this case forfeited." The same rule has been applied where paint was being removed from the outside of a wooden building by means of a naphtha or gasoline torch, and these decisions well illustrate what we conceive to be the true legal principle.

In *First Cong. Church* v. *Ins. Co.*, 158 Mass., 475, the plaintiff contended that the use of the torch and the change in conditions affecting the risk occurred through making ordinary repairs in a reasonable and proper way, and that in the prohibitive provision of the policy there was an implied exception of what is done in making ordinary repairs. Acting upon this, the trial Judge submitted this single question to the jury: "Was the method used the method ordinarily pursued to remove the paint on the outside of a building preparatory to scraping it off to repaint it?" Affirmative answer being returned the presiding Judge ordered a verdict for the plaintiff. The Law Court set aside the verdict on the ground that the question submitted did not sufficiently present all the matters of fact in issue, including the material of which the outside of the building was composed, its character and condition, the season of the year, etc., but was too general in its form. The court held that "such provisions in the policy were not intended to prevent the making of necessary repairs and the use of such means as are reasonably required therefor," and that if the use of naphtha, at the time and in the manner in which it was used, was reasonable and proper in the repair of the building, having reference to the danger of fire as well as other considerations, then the policy was not thereby forfeited. In *Garebrant* v. *Ins. Co.*, 75 N. J. L., 577, a torch was used for the same purpose, and the court held that the policy was not thereby avoided as it

permitted mechanics to be employed for a period of fifteen days in making repairs, that time had not expired when the fire occurred, the necessity of repairs existed and the method was reasonable and proper. In *Lebanon Co.* v. *Ins. Co.*, 237 Pa. St., 360, (1912), where the working of mechanics was prohibited in general terms, it was held not to cover a case of ordinary repairs necessary for the proper care and preservation of the property and that, although a torch was used, the presiding Judge did not err in refusing to direct a verdict for the defendant either on the ground of keeping or using prohibited articles or of increase of risk, and that the case was properly submitted to the jury.

Our conclusion on this branch of the case therefore is, that the plaintiff was neither keeping nor using gasoline within the inhibition of this policy, nor did his acts constitute a breach of the increase of risk ·clause as a matter of law. The most that the defendant can successfully claim is that the question of increase of risk is a question of fact and should be submitted to the jury under proper instructions. The .nonsuit was therefore improperly ordered.

3.· *Failure to furnish proof of loss.*

The defendant also set up in its brief statement of defense the plaintiff's failure to furnish a proof of loss, but this point is not urged in argument. It is proper however to say that in view of the correspondence between the parties and of the fact that the defendant denied all liability, the jury might well have found that it had waived this requirement. Such waiver is a question of fact, *Robinson* v. *Ins. Co.*, 90 Maine, 385, and the court cannot say that under the evidence in this case the plaintiff is precluded from recovery on that ground.

*Exceptions  sustained.*